## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MICHELE CAMPBELL,

      Plaintiff,                       Case No. 13-14399

v.                                    Hon. Gerald E. Rosen

G4S SECURE SOLUTIONS (USA) INC.,

      Defendant.

_____/

## OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____August 18, 2015_____

PRESENT:  Honorable Gerald E. Rosen
                Chief Judge, United States District Court

## I.  INTRODUCTION

Plaintiff Michele Campbell commenced this action in Shiawassee County Circuit

Court in August of 2013, alleging that her former employer, Defendant G4S Secure

Solutions (USA) Inc., violated the Michigan Whistleblowers' Protection Act ("WPA"),

Mich. Comp. Laws § 15.361 *et seq.,* by retaliating against her and ultimately terminating

her employment for investigating and reporting safety violations committed by a

subordinate employee, Chad Webster.[1]  Defendant removed the case to this Court on

_____

[1]Plaintiff's complaint also appeared to assert a common-law claim of wrongful discharge,
but Plaintiff has since stipulated to the dismissal of any such claim.

October 18, 2013, citing the parties' diverse citizenship. *See* 28 U.S.C. §§ 1441(a), 1332(a).

By motion filed on July 23, 2014, Defendant now seeks summary judgment in its favor on Plaintiff's claim under the WPA. In support of this motion, Defendant contends (i) that Plaintiff has failed to establish that she engaged in protected activity that could support her claim of retaliation; (ii) that, even if she engaged in protected activity, the record fails to establish the requisite causal link between such activity and the adverse employment actions she suffered; and (iii) that, even if Plaintiff could establish a *prima facie* case of retaliation, she has failed to show that Defendant's stated, non-retaliatory reason for terminating her employment was a mere pretext for unlawful retaliation. Plaintiff's August 8, 2014 response to this motion largely fails to address the arguments advanced by Defendant, and instead focuses almost exclusively upon (i) alleged bias in Defendant's decisionmaking arising from the relationship among Defendant, its client General Motors, and a General Motors employee, Beth Webster,[2] and (ii) Plaintiff's qualifications as an employee. On August 10, 2014, Defendant filed a reply in further support of its motion.

Having reviewed the parties' briefs in support of and opposition to Defendant's motion, as well as their accompanying exhibits and the record as a whole, the Court finds

---

[2]Ms. Webster is the mother of Chad Webster, the employee who Plaintiff accused of safety violations.

2

that the relevant allegations, facts, and legal arguments are adequately presented in these written submissions, and that oral argument would not aid the decisional process. Accordingly, the Court will decide Defendant's motion "on the briefs." *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan. This opinion and order sets forth the Court's rulings on this motion.

## II. FACTUAL AND PROCEDURAL BACKGROUND

In 2000, Plaintiff Michele Campbell was hired by non-party Pinkerton and assigned to perform fire prevention duties on behalf of a Pinkerton client, General Motors ("GM"). Another company, Securitas, subsequently assumed the contract for fire prevention services at various GM facilities, and Plaintiff and a number of other Pinkerton employees began to work for Securitas in the performance of this GM contract.

In the fall of 2011, Defendant G4S Secure Solutions (USA) Inc. won the contract to provide security and fire protection services for a number of GM facilities. Upon securing this contract, Defendant hired a number of Securitas employees, including Plaintiff, and Plaintiff was promoted to the position of fire chief. In this position, Plaintiff was responsible for fire safety compliance, inspection compliance, and emergency response at GM's Milford Proving Grounds in Milford, Michigan. She was also responsible for monitoring and evaluating the performance of the fire supervisors, fire officers, and site coordinators who Defendant had assigned to the Milford Proving Grounds and two other GM facilities, the Desert Proving Grounds in Yuma, Arizona and the Wixom Powertrain facility in Wixom, Michigan. In her position as fire chief,

3

Plaintiff reported to security specialist James Krumbach, who also had served as Plaintiff's immediate supervisor during her employment with Pinkerton and Securitas.

**A.     Plaintiff Raises Concerns To Her Supervisor About the Performance of Two of Her Subordinates.**

As fire chief, Plaintiff supervised a number of employees, including Chad Webster, who was employed by Defendant as a site coordinator for one of GM's facilities.  In January of 2013, Plaintiff discovered that Webster apparently had not been completing certain fire safety inspections at the GM facility to which he was assigned, but had been entering data into Defendant's visual management tool ("VMT") to make it appear as though he had.  (Defendant's Motion, Ex. 3, Plaintiff's Dep. at 50-53.)  Upon making this discovery, Plaintiff reported her suspicions about Webster to her supervisor, Jim Krumbach, and Krumbach instructed Plaintiff to investigate the matter further, gather relevant documentation, and report back to him.  (*See id.* at 50-53.)[3]  Plaintiff also reported her concerns about Webster's job performance to Chris Davis, a fire prevention and protection specialist for Defendant, and Davis likewise recommended that Plaintiff investigate further and report her findings to Krumbach.  (*See* Plaintiff's Response, Ex. 4, Davis Dep. at 5, 13-16.)[4]

_____

[3]Plaintiff also advised Krumbach that another employee under her supervision, Michael Stevenson, had failed to complete his inspection reports, and Krumbach asked Plaintiff to investigate and report on this matter as well.  (*See id.* at 68-72.)

[4]Although Davis had been Plaintiff's supervisor in the past, Plaintiff no longer reported to Davis at the time she advised him about her concerns with Webster's job performance.  (*See id.* at 13-14.)

4

A few weeks later, in late March of 2013, Plaintiff gave Krumbach the documentation she had gathered regarding Chad Webster's alleged lack of compliance with his job duties, along with an itemized list of purported deficiencies she had identified in Webster's job performance.  (*See* Plaintiff's Dep. at 67-72, 75-76.)[5]  Krumbach did not instruct Plaintiff to discipline Webster, but instead advised her that he would take care of it.  (*See* Plaintiff's Dep. at 90-92, 109-10.)  Plaintiff was aware that Krumbach discussed this matter with his superior, U.S. operation manager Don Drent, and that Krumbach also contacted Webster's mother, GM security manager Beth Webster, regarding her son's job performance issues. (*Id.* at 46-48, 92-94, 141-42; *see also* Plaintiff's Response, Ex. 3, Krumbach Dep. at 19-20.)  Plaintiff did not know, however, whether any disciplinary action was taken against Webster.  (*See* Plaintiff's Dep. at 92.)[6]

## B.    Plaintiff Is Removed from the GM Account and Then Terminated.

In May of 2013, Krumbach left Defendant's employ to take a position directly with GM.  Krumbach's former position as security specialist was assumed by Gail Pyne,

---

[5]This itemized list cited Webster's alleged deficiencies in such areas as completion of inspections and corresponding documentation, fulfilling Defendant's reporting requirements, addressing attendance issues of the employees who reported to him, and reaching out for assistance when needed.  (*See* Defendant's Motion, Ex. 8.)  Plaintiff prepared a similar list of performance concerns for Michael Stevenson, (*see id.),* and provided this list and supporting documentation to Krumbach, (*see* Plaintiff's Dep. at 68-70).

[6]Krumbach testified that he verbally counseled Chad Webster, and that he was told by Don Drent that Webster was being transferred to a different facility.  (*See* Krumbach Dep. at 16-17, 23, 26.)

who became Plaintiff's direct supervisor.  As Plaintiff observes, Pyne had a pre-existing relationship with Chad Webster's mother, Beth Webster:  Pyne and Ms. Webster had been to each other's homes, Pyne had taken her nieces and nephew horseback riding at Ms. Webster's home, and Ms. Webster gave Pyne a swing set.  (Plaintiff's Response, Ex. 1, Pyne Dep. at 32.)  Pyne further testified that she considered Ms. Webster a customer rather than a friend, and that she spoke with Ms. Webster twice a week, and occasionally more frequently, in Webster's role as GM's security manager.

Soon after she became Plaintiff's supervisor, Pyne learned of the apparent existence of a special attendance and time off policy that was applicable only to supervisors.  (Defendant's Motion, Ex. 9, Pyne Decl. at ¶ 5.)  Upon questioning one of Defendant's supervisory employees about this matter, Pyne was given a copy of a document entitled "Supervisor Contract," and was told that Plaintiff had issued this document to her fellow supervisor in March of 2013.  (*Id.* at ¶ 6; *see also* Defendant's Motion, Ex. 10, Supervisor Contract.)

Following this initial interview and her review of the "supervisor contract," Pyne decided to investigate this matter further by questioning several other supervisors, including Plaintiff.  (*See* Pyne Decl. at ¶¶ 7-8.)  According to a May 22, 2013 report Pyne prepared for her supervisor, Don Drent, Plaintiff stated during her interview (i) that she had drafted the supervisor contract with the approval of her then-supervisor, Jim Krumbach; (ii) that this contract was motivated by the belief that Defendant's supervisors "were getting screwed" by being denied a raise, and thus were entitled to the offsetting

6

benefit of a more favorable attendance policy; (iii) that the contract was not distributed by e-mail or through Defendant's computer system, but only through hard copies given out by Plaintiff herself to other supervisors; (iv) that the supervisors were told to keep quiet about the existence of the contract and not to discuss it with non-supervisory employees; (v) that the records tracking the time off taken by supervisors pursuant to the contract were thrown away at Plaintiff's direction; (vi) that the contract was no longer in effect once Krumbach left Defendant's employ; and (vii) that Plaintiff did not view the supervisor contract as a violation of Defendant's attendance policy because Krumbach had approved it.  (Pyne Decl., Ex. 1, 5/22/2013 Report at 1-2.)[7]

Based on her interviews of Plaintiff and other supervisors, Pyne made the following findings in her report to Drent:

> (i) that Defendant's security leadership for GM's Milford Proving Grounds facility "implement[ed] an unsanctioned attendance/time-off policy (called 'Supervisor Contract') for supervisors in March 2013;"

> (ii)  that this policy was "conceived and implemented by" Plaintiff but "sanctioned by" her then-supervisor, Jim Krumbach;

> (iii) that the method through which Plaintiff implemented the "Supervisor Contract" — i.e., "in hard copy only, with no email trail or on-line presence of the policy" — was "indicative of [Plaintiff's] understanding that the policy was inappropriate even though it had been

_____

[7]Krumbach confirmed at his deposition that while he was Plaintiff's supervisor, he gave Plaintiff a directive to modify Defendant's attendance policy as it applied to those employees within his control.  (See Krumbach Dep. at 29-30.)  Krumbach further testified that so far as he was aware, Plaintiff did not vary from this directive.  (See id. at 30-31.)  Pyne acknowledged at her deposition that she did not interview Krumbach during her investigation of the supervisor contract, (see Pyne Dep. at 23-24), but it should be noted that Krumbach no longer worked for Defendant at the time of Pyne's investigation.

approved by her direct supervisor;" and

   (iv) that Plaintiff's actions in "directing that the records regarding the supervisor[s'] use of the 'Supervisor Contract' be destroyed (document falsification) to cover up the existence of the 'Contract' are actions unbecoming a member of management and are of significant concern with regard to her overall integrity."

(Pyne Decl., Ex. 1, 5/22/2013 Report at 1.)  In light of these findings, Pyne recommended to Drent that Plaintiff be removed from the GM account.  (*See* Pyne Decl. at ¶ 12.)

   Upon reviewing Pyne's report and supporting documentation, and after consulting with representatives of Defendant's human resources department and other senior management officials, Drent concurred in Pyne's recommendation and removed Plaintiff from the GM account.  (*See* Defendant's Motion, Ex. 1, Drent Decl. at ¶¶ 16-17.)  On May 30, 2013, Pyne met with Plaintiff to inform her of this decision.  (*See* Pyne Decl. at ¶ 17; *see also* Plaintiff's Dep. at 94-96.)  A few days later, on June 8, 2013, Plaintiff's employment with Defendant was "administratively terminated" due to a lack of available work for someone at Plaintiff's level following her removal from the GM account, (Defendant's Motion, Ex. 13, Baker Decl. at ¶ 7), and Plaintiff was notified of her termination in a letter dated June 18, 2013, (*see* Defendant's Motion, Ex. 14, 6/18/2013 Letter).

## C.   Procedural Background

   Plaintiff brought this suit in August of 2013, asserting a claim against Defendant

under Michigan's Whistleblowers' Protection Act ("WPA").[8]  Specifically, Plaintiff

alleges that Defendant unlawfully terminated her employment because she was about to

report to a state agency — namely, the Michigan Occupational Safety and Health

Administration ("MIOSHA") — that Defendant's employees were engaged in the

falsification of records.  (*See* Complaint at ¶¶ 24, 27, 32-35.)

## III.  ANALYSIS

### A.     The Standards Governing Defendant's Motion

Through the present motion, Defendant seeks summary judgment in its favor on

Plaintiff's WPA claim.  Under the pertinent Federal Rule governing this motion,

summary judgment is proper "if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(a).  As the Supreme Court has explained, "the plain language of Rule 56[] mandates

the entry of summary judgment, after adequate time for discovery and upon motion,

against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of

proof at trial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence "in

a light most favorable to the party opposing the motion, giving that party the benefit of all

reasonable inferences."  *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.,* 477 F.3d

---

[8]As noted earlier, Plaintiff's complaint appears to assert an additional claim of wrongful discharge in violation of public policy, but she has stipulated to the dismissal of any such claim.

854, 861 (6th Cir. 2007).  Yet, the nonmoving party may not rely on bare allegations or denials, but instead must support a claim of disputed facts by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  Finally, "[a] mere scintilla of evidence is insufficient" to withstand a summary judgment motion; rather, "there must be evidence on which the jury could reasonably find for the non-moving party."  *Smith Wholesale,* 477 F.3d at 861 (internal quotation marks and citation omitted).

**B.**    **Plaintiff Has Failed as a Matter of Law To Establish a *Prima Facie* Case of Retaliation Against Her Protected Whistleblowing Activity.**

As noted earlier, Plaintiff's sole remaining claim in this case is that Defendant retaliated against her in violation of Michigan's Whistleblowers' Protection Act ("WPA"), Mich. Comp. Laws § 15.361 *et seq.,* by terminating her employment as she was about to report to a state agency that one of Defendant's employees, Chad Webster, had committed a safety violation.  The pertinent WPA provision giving rise to this claim states in relevant part:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee . . . reports or is about to report, verbally or in writing, a violation or a

10

suspected violation of a law or regulation or rule promulgated pursuant to a law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body . . . .

Mich. Comp. Laws § 15.362.

A retaliation claim under the WPA is analyzed under the familiar burden-shifting framework employed by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973). *See Taylor v. Modern Engineering, Inc.,* 252 Mich. App. 655, 653 N.W.2d 625, 628 (2002); *Cooney v. Bob Evans Farms, Inc.,* 645 F. Supp.2d 620, 628 (E.D. Mich. 2009), *aff'd,* 395 F. App'x 176 (6th Cir. Aug. 25, 2010).[9] Under the first step of this tripartite approach, Plaintiff must establish a *prima facie* case of retaliation based on her whistleblowing activity. *Taylor,* 653 N.W.2d at 628. Once she does so, Defendant has the burden of articulating a legitimate, non-retaliatory reason for taking adverse action against Plaintiff. *Taylor,* 653 N.W.2d at 628. Finally, if Defendant meets this burden of production, Plaintiff "then has the opportunity to prove that the

---

[9]At one point in her response to Defendant's summary judgment motion, Plaintiff appears to suggest that she has produced direct evidence of retaliation that obviates the need for a *McDonnell Douglas* inquiry. (*See* Plaintiff's Response Br. at 23-24.) Yet, as Plaintiff herself recognizes, direct evidence is evidence that does not "require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part" by a desire to retaliate against Plaintiff's exercise of protected activity. *See Johnson v. Kroger Co.,* 319 F.3d 858, 865 (6th Cir. 2003). Nothing in the record forges such a direct link between Plaintiff's discharge and a decisionmaker's retaliatory motive. Indeed, as discussed below, Plaintiff is in an especially poor position to produce such direct evidence here, where the record fails to establish that any relevant decisionmaker was even aware of Plaintiff's exercise of protected activity, much less that the decision to discharge Plaintiff was made in retaliation against any such protected activity.

legitimate reason offered by the defendant was not the true reason, but was only a pretext" for taking retaliatory action against her.  *Taylor,* 653 N.W.2d at 628.

### 1.     Plaintiff Did Not Engage in Protected Activity as Defined in the WPA.

To establish a *prima facie* case of retaliation under the WPA, Plaintiff must show (1) that she was engaged in protected activity as defined by the WPA, (2) that she was discharged or otherwise discriminated against, and (3) that "a causal connection exists between the protected activity and the discharge or adverse employment action."  *West v. General Motors Corp.,* 469  Mich. 177, 665 N.W.2d 468, 471-72 (2003).  As the first issue raised in its present motion, Defendant challenges Plaintiff's showing as to the first element of this standard, arguing that the record fails to demonstrate that Plaintiff engaged in protected activity by either reporting a suspected violation of the law to a public body or preparing to do so.  The Court agrees.

As noted earlier, the WPA itself defines protected activity as either "report[ing]" or being "about to report" a "violation or a suspected violation of a law or regulation or rule promulgated" under local, state, or federal law.  Mich. Comp. Laws § 15.362.[10]  In

---

[10]In addition, this report or effort to report must be directed at a "public body."  *See* Mich. Comp. Laws § 15.362; *see also* Mich. Comp. Laws § 15.361(d) (defining the term "public body" as used in the WPA).  In this case, Plaintiff has alleged and testified that she planned to report the findings from her investigation of Chad Webster to the Michigan Occupational Safety and Health Administration ("MIOSHA"), (*see* Complaint at ¶ 34; Plaintiff's Dep. at 37), and it is clear that MIOSHA qualifies as a "public body" within the meaning of the WPA, *see, e.g., Burns v. Mahle Engine Components USA, Inc.,* No. 13-2324, 605 F. App'x 522, 527 (6th Cir. March 31, 2015) (observing that "[n]either party disputes" that the plaintiff in that case "engaged in a protected activity under the WPA" by planning to contact MIOSHA); *Thomas v. Pinnacle Foods Groups LLC,* No. 13-10103, 2013 WL 5372812, at *5-*7 (E.D. Mich. Sept. 25, 2013) (addressing a WPA claim arising from allegations that the plaintiff planned to file a complaint

this case, Plaintiff concedes that she did not actually lodge a complaint or otherwise make a report within the meaning of the WPA.  (*See* Plaintiff's Dep. at 37.)  Rather, her claim of protected activity rests solely upon the theory that she was "about to report" a suspected safety violation to MIOSHA.  (*See id.*)  To sustain this claim of protected activity, and thereby establish the first prong of her *prima facie* case of retaliation, Plaintiff must "show by clear and convincing evidence" that she or someone acting on her behalf was "about to report, verbally or in writing, a violation or suspected violation" of local, state, or federal law.  Mich. Comp. Laws § 15.363(4); *see also Shallal v. Catholic Social Services,* 455 Mich. 604, 566 N.W.2d 571, 575 (1997) (noting the WPA's express adoption of the heightened "clear and convincing" standard of proof in cases where an employee claims that she was "about to report" a violation or suspected violation of the law).

As the Sixth Circuit has emphasized, the Court must consider this elevated "clear and convincing" burden of proof in determining whether Plaintiff's WPA claim can withstand an award of  summary judgment in Defendant's favor — that is, the Court must ask whether "there is sufficient evidence to allow a jury to conclude by clear and convincing evidence" that Plaintiff was about to report a violation or suspected violation of the law to MIOSHA.  *Talhelm v. ABF Freight Systems, Inc.,* No. 08-2492, 364 F.

---

with MIOSHA or its federal counterpart, the Occupational Safety and Health Administration); *Jennings v. County of Washtenaw,* 475 F. Supp.2d 692, 711 (E.D. Mich. 2007) (likewise addressing a WPA claim based on allegations that the plaintiff was about to file a complaint with MIOSHA).

13

App'x 176, 181 (6th Cir. Jan. 26, 2010); *see also Jennings,* 475 F. Supp.2d at 712 (noting that the party opposing a summary judgment motion must satisfy "any heightened burden of proof required by the substantive law for an element of [that party's] case" (internal quotation marks and citation omitted)).  In addition, the Michigan Supreme Court has emphasized that under the plain language of the WPA, an employee must be "on the verge of" reporting a violation or suspected violation of the law in order to satisfy the "about to report" prong of the statutory standard.  *Shallal,* 566 N.W.2d at 575.

The case law provides considerable guidance as to the sorts of evidence that can (and cannot) satisfy the WPA's "about to report" standard for protected activity.  In *Pethers v. Metro Lift Propane,* No. 09-10516, 2010 WL 3023887, at *1 (E.D. Mich. July 29, 2010), for example, this Court addressed a WPA claim brought by a driver, Robert Pethers, who delivered propane cylinders to businesses in the Detroit metropolitan area.  According to Pethers, "prior to his discharge, he and five or six of his fellow drivers complained almost daily amongst themselves" about threats of firing and other forms of harassment engaged in by management-level employees.  *Pethers,* 2010 WL 3023887, at *4.  When his fellow drivers raised questions as to "where they could report" this management misconduct, Pethers advised them that he would "look into seeing what [he] could do."  *Id.* (alteration in original) (internal quotation marks omitted).  Pethers conceded, however, that he "never told anyone in management he was going to file a complaint," and "[i]t was not until after he was fired and did some investigating on-line that he decided to file a complaint with" the federal Occupational Safety and Health

14

Administration ("OSHA").  *Id.*  Under this record, this Court concluded that Pethers had failed to produce evidence that he was "about to report" a violation or suspected violation of the law prior to his discharge, observing that Pethers had testified only to "general discussions with co-workers kicking around the idea of whether a law might have been violated," and reasoning that these "discussions about the possibility of filing a complaint somewhere d[id] not satisfy [Pethers'] evidentiary burden under the WPA to show by 'clear and convincing evidence' that he was about to report a suspected violation to a public body before he was terminated."  *Id.* at *8; *see also Richards v. Sandusky Community Schools,* 102 F. Supp.2d 753, 763 (E.D. Mich. 2000) (holding that evidence that the plaintiff in that case had "received the appropriate paperwork from OSHA" for reporting alleged health and safety violations but had "never completed the paperwork" fell "drastically short of the clear and convincing proof required" to demonstrate that the plaintiff was about to report these suspected violations to a public body).

In *Fogwell v. Klein,* No. 223761, 2001 WL 1134883, at *2 (Mich. Ct. App. Sept. 25, 2001), in contrast, the Michigan Court of Appeals held that the plaintiff in that case, a dental hygienist, had raised a genuine issue of material fact as to whether she was about to report a suspected violation of the law to a public body.  In so ruling, the court pointed to evidence of "several activities that indicated [the plaintiff] was about to report," including "copying of records, attempts to contact [an] insurance hotline, and obtaining a complaint form" from a state agency.  2001 WL 1134883, at *2.  In addition, the court observed that the plaintiff had informed the dentist for whom she worked of these

15

activities "and her concerns with his billing practices only one week prior to her termination," and that she was discharged "shortly after she refused to answer a direct question concerning her intentions to stop pursuing the matter." *Id.* Under this record, the court found that a reasonable trier of fact "could conclude that [the] plaintiff's actions, coupled with her refusal to answer [her employer's] question about not reporting him, provided clear and convincing evidence to satisfy the 'about to report' language of the WPA." *Id.*; *see also Shallal,* 566 N.W.2d at 576, 578-79 & n.9 (holding that the plaintiff in that case produced sufficient evidence that she was about to report a violation to a public body, where she expressly confronted and threatened her supervisor that "she would report him" to the Michigan Department of Social Services ("DSS") and other entities "if he did not straighten up," and where she corroborated this threat with calendar entries reflecting her contemporaneous discussions with co-workers regarding the need to report this supervisor).

Returning to the present case, the Court finds that the facts here are more akin to those presented in *Pethers,* and that the record lacks evidence that Plaintiff took significant preparative steps of the sort deemed sufficient in *Fogwell* and *Shallal* to satisfy the WPA's "about to report" standard. According to Plaintiff's own testimony, she did not know how to go about lodging a complaint with MIOSHA regarding the conduct of her subordinate employee, Chad Webster, and she acknowledged that she would "have to investigate" how to make such a report. (Plaintiff's Dep. at 37.) She opined that she would have had to visit the MIOSHA website in order to identify the

16

individual to whom she should report Webster's conduct, but she conceded that she had not yet made this determination at the time of her discharge. (*See id.* at 38-39.) Rather, she stated that she had only "look[ed] on" the MIOSHA website prior to her discharge, but had not "complet[ed] [her] research" as to how to make a report to this agency. (*Id.* at 39-40.)

Even viewing this record in a light most favorable to Plaintiff, a reasonable trier of fact could not conclude that it contains clear and convincing evidence that Plaintiff was about to report suspected safety violations to MIOSHA. Just as the plaintiff in *Pethers* promised his co-workers that he would "look into" the possibility of reporting suspected misconduct to an outside agency, but then proceeded no further until after his discharge, Plaintiff here took only the most tentative steps toward making a report to MIOSHA, visiting the agency's website but admittedly never completing her research as to how she might go about lodging a complaint with this agency. Unlike the plaintiff in *Fogwell,* Plaintiff here did not pursue any concrete measures in furtherance of a report to a state agency, such as gathering materials to submit to this agency or obtaining a complaint form from the agency. Nor, in contrast to the plaintiffs in *Fogwell* and *Shallal,* did Plaintiff here directly confront the target of her suspicions of wrongdoing, Chad Webster, or otherwise alert him that she intended to share these concerns with an outside agency. Indeed — and as discussed at greater length below — Plaintiff does not claim to have advised ***any*** fellow employee of any plan to report the findings of her investigation into Chad Webster's activities to MIOSHA or any other outside agency. Rather, she testified

17

that she reported the results of this investigation to her supervisor, Jim Krumbach, and then relied on Krumbach's assurances that "he would take care of it." (Plaintiff's Dep. at 90-92, 94.) This record simply fails to show, much less by clear and convincing evidence, that Plaintiff was "on the verge of" reporting a violation or suspected violation of the law to a public body. *See Shallal,* 566 N.W.2d at 575.

To the extent that Plaintiff's response in opposition to Defendant's motion even addresses the question whether the evidence here could satisfy the "about to report" standard for protected activity under the WPA, Plaintiff states in wholly conclusory fashion — and without any discussion, or even mention, of the pertinent case law — that she engaged in protected activity by "report[ing] actual serious safety violations to her two most immediate supervisors (Krumbach and [Chris] Davis)" and then "beg[inning] the process of looking to report the violations to [MI]OSHA with the intent to do so." (Plaintiff's Response Br. at 24; *see also id.* at 25 (maintaining that Plaintiff "engaged in protected activity as defined by the WPA" by "reporting Chad Webster's falsification of test records in violation of OSHA and MIOSHA").) As to the former claim of protected activity, the case law confirms that an internal report to a supervisor does not qualify under the WPA as reporting or being about to report to a "public body." *See Talhelm,* 364 F. App'x at 182-83; *Thomas,* 2013 WL 5372812, at *6; *Jennings,* 475 F. Supp.2d at 710.[11] As for Plaintiff's cursory assertion that she engaged in protected activity by

---

[11]It is important to emphasize that this rule applies only where, as here, an employee works for a private employer. The Michigan Supreme Court has held that if an employee works

18

"beg[inning] the process" of determining how to report a violation to MIOSHA, the Court has already explained that the tentative step taken by Plaintiff here does not suffice under the relevant case law — which, again, Plaintiff does not even discuss, much less attempt to distinguish — to permit a trier of fact to conclude by clear and convincing evidence that Plaintiff was "about to report" a violation or suspected violation of the law to a public body. Accordingly, the Court agrees with Defendant that Plaintiff has failed as a matter of law to establish the "protected activity" element of a *prima facie* case under the WPA.

## 2. Plaintiff Has Failed to Establish a Causal Connection Between Any Protected Activity and Her Discharge.

Even assuming that Plaintiff had engaged in protected activity, Defendant contends that she cannot establish the third and final element of a *prima facie* case of retaliation under the WPA — *i.e.,* that a causal connection exists between her protected activity and her discharge. *See West,* 665 N.W.2d at 471-72. The Court again agrees.

As a matter of basic logic, and as the case law confirms, there can be no causal connection between protected activity and an adverse employment action unless the decisionmaker who took the complained-of adverse action against an employee had

---

for an agency that itself qualifies as a "public body" under the WPA, "[t]here is no condition in the statute that [this] employee must report wrongdoing to an outside agency or higher authority to be protected by the WPA." *Brown v. Mayor of Detroit,* 478 Mich. 589, 734 N.W.2d 514, 517 (2007) (footnote omitted); *see also Talhelm,* 364 F. App'x at 182-83 (discussing the ruling in *Brown*). Rather, a government employee may satisfy the "public body" requirement of the WPA by reporting (or being about to report) a violation or suspected violation of the law to his or her own agency, provided that this agency falls within the WPA's definition of a "public body." *See Brown,* 734 N.W.2d at 517 (explaining that "[i]t does not matter if the public body to which the suspected violations were reported was also the employee's employer").

knowledge of the employee's protected activity.  In *Kaufman & Payton, P.C. v. Nikkila,*
200 Mich. App. 250, 503 N.W.2d 728, 732 (1993), for example, the Michigan Court of
Appeals held that an employer cannot be held liable for a claim of retaliation under the
WPA unless the employer has "objective notice of a report or a threat to report by the
whistleblower."  Consistent with this ruling, a number of courts, including this one, have
emphasized that the "causal connection" element of a *prima facie* case of retaliation
requires evidence that "the relevant decision-maker . . . ha[d] actual knowledge of the
[plaintiff's] protected activity before making the [challenged] decision."  *Burns,* 605 F.
App'x at 527; *see also Thomas,* 2013 WL 5372812, at *5; *Pethers,* 2010 WL 3023887, at
*8; *Jennings,* 475 F. Supp.2d at 713; *Carruthers v. Isringhausen, Inc.,* No. 296250, 2011
WL 1901884, at *3 & n.2 (Mich. Ct. App. May 19, 2011).

In this case, Plaintiff's own deposition testimony squarely defeats any possible
finding that a relevant decisionmaker — or, for that matter, ***any*** employee of Defendant
— had knowledge or notice of Plaintiff's purported protected activity prior to her
discharge.  In particular, Plaintiff has testified:

> Q:   Did you think that what [Chad] Webster and [Michael] Ste[v]enson
>      had done was somehow unlawful?
>
> A:   Yes.  It's against OSHA [regulations].  We are held up to perform
>      these fire inspections per OSHA and GM standards, because they
>      follow OSHA . . . , and they didn't complete the inspections as
>      they're supposed to.
>
> Q:   Is there anything in the report [Plaintiff submitted to her supervisor,
>      Jim Krumbach] to indicate that you had concluded the conduct was
>      unlawful, or violated OSHA standards, or MI-OSHA standards or

20

regulations?

A:     No.  It's not in the report.

                         * * * *

Q:     So you never provided any information to Krumbach to indicate that
       you thought what Stevenson or Webster had done was somehow
       unlawful or violated MI-OSHA or OSHA standards; did you?

A:     I did not put it in writing, no.

                         * * * *

Q:     . . . .  You never mentioned anything to [Krumbach] to suggest that
       you thought what Webster or [Stevenson] had done violated the law,
       or MI-OSHA, or OSHA regulations or standards; did you?

A:     I completed my investigation and I gave it to him.

Q:     I'm asking you what you told him.

A:     I did not specifically speak those words, but I brought it to his
       attention because of life safety, and that they weren't doing their
       jobs.

Q:     And I'm not asking if you specifically said those words.  What I'm
       asking you is did you convey anything to Mr. Krumbach at any time
       indicating that you thought Webster or Stevenson had violated the
       law or had violated OSHA or MI-OSHA standards[?]

A:     I did not specifically speak those words, but falsification of fire
       inspections is a violation of OSHA and MI-OSHA.

Q:     You never referenced OSHA or MI-OSHA or the law, did you?

A:     No.

Q:     And that would be true not just as to Krumbach, but a[s] to anyone at
       [Defendant] G4S prior to your removal from the [GM] account;
       correct?

21

* * * *

A:    No, I reported it to Jim [Krumbach], and Jim said he was going to take care of it.

* * * *

Q:    And am I also correct that you never told Krumbach that you were going to go to MI-OSHA or OSHA with any of this information?

A:    No.  I reported it to him and he said he was going to take care of it, and then when he left [to work directly for GM], that's when I was looking into I needed to report this, because they didn't do their job.

Q:    But you never told anyone that you were thinking about reporting it, did you?

A:    No, I did not tell anybody, but I was going to report it.

(Plaintiff's Dep. at 106-110.)

The individuals involved in Defendant's decision to remove Plaintiff from the GM account and terminate her employment have confirmed Plaintiff's testimony on this point. Defendant's U.S. operation manager, Donald Drent, has stated that he made the decision to remove Plaintiff from the GM account, and that at the time he did so, he "had no knowledge that [Plaintiff] intended to make a report to OSHA, MI-OSHA, or any other public body." (Defendant's Motion, Ex. 1, Drent Decl. at ¶¶ 17, 19.)[12]  Similarly, Plaintiff's supervisor at the time of her discharge, Gail Pyne, has acknowledged that she

---

[12]Drent further states that he had no knowledge at the time that Plaintiff had conducted an internal investigation into Chad Webster's activities, nor was he aware that Plaintiff had raised any concerns regarding possible violations of the law or breaches of any legal requirements. (*See id.* at ¶¶ 20-21.)

22

played a role in the removal of Plaintiff from the GM account, both by conducting the investigation that led to Plaintiff's removal and by recommending this course of action to the ultimate decisionmaker, Donald Drent, (*see* Defendant's Motion, Ex. 2, Pyne Dep. at 23; Ex. 9, Pyne Decl. at ¶ 12), but she, like Drent, has denied having any knowledge at the time that Plaintiff intended to make a report to any public body, (*see* Pyne Decl. at ¶ 14).  Because the testimony of Plaintiff and the relevant decisionmakers alike uniformly refutes the notion that these decisionmakers had any knowledge in the pertinent time frame that Plaintiff had engaged in protected activity, it follows that Plaintiff cannot establish a causal connection between any such protected activity and her removal from the GM account and subsequent discharge.  *See Miller v. CVS Pharmacy, Inc.,* 779 F. Supp.2d 683, 695 (E.D. Mich. 2011) (finding that the plaintiff in that case had failed to establish a *prima facie* case of retaliatory discharge where she "failed to show that the individual who made the decision to discharge her . . . was aware that she had engaged in any protected activity").

Plaintiff's sole argument against this conclusion rests on an appeal to temporal proximity.  Specifically, Plaintiff claims that her discharge followed "quickly" after she reported to her then-supervisor, Jim Krumbach, that Chad Webster had falsified records by representing that he had conducted fire safety inspections that he had not actually performed.  (Plaintiff's Response Br. at 24-25.)  Yet, even assuming that the temporal proximity identified by Plaintiff was sufficiently close, standing alone, to support the inference of a causal connection between Plaintiff's report of her findings to Krumbach in

23

late March of 2013 and Plaintiff's removal from the GM account roughly two months later, Plaintiff's argument rests upon the false premise that her internal report to Krumbach is somehow relevant to the causal connection element of her *prima facie* case. As explained earlier, Plaintiff's internal report to Krumbach does not qualify as protected activity under the WPA, so it is simply immaterial to the present inquiry whether Plaintiff's discharge followed closely on the heels of this report.

Rather, the pertinent question, for purposes of determining temporal proximity, is whether a decisionmaker became aware of Plaintiff's alleged ***protected activity*** — *i.e.,* the steps she took toward reporting Chad Webster's activities to MIOSHA — within a short time before Plaintiff was removed from the GM account and discharged. By Plaintiff's own admission, she did not advise any of Defendant's employees, much less any decisionmaker, of her intention to make a report to MIOSHA, nor of any steps she took in furtherance of this intended report to a public body. No matter how many legal violations Plaintiff believes she might have uncovered in her investigation of Chad Webster, the lack of any evidence that any decisionmaker had knowledge of her engagement in activity protected by the WPA — namely, reporting or being about to report these violations to a public body, as opposed to her supervisor —precludes her from forging the requisite causal connection between any such protected activity and Defendant's decision to remove her from the GM account and terminate her employment. The Court concludes, therefore, that Plaintiff has failed to establish the causal connection element of a *prima facie* case of retaliation under the WPA.

24

C. **Even Assuming That Plaintiff Could Establish a *Prima Facie* Case of Retaliation, She Has Failed to Produce Evidence That Defendant's Legitimate, Non-Retaliatory Reason for Her Discharge Is Pretextual.**

While the Court has concurred in Defendant's challenges to the first and third elements of Plaintiff's *prima facie* case of retaliation, Defendant argues in addition that Plaintiff cannot meet her burden, under the third step of the *McDonnell Douglas* inquiry, to show that the legitimate reason identified by Defendant for removing Plaintiff from the GM account and then terminating her employment is a pretext for unlawful retaliation. As discussed briefly below, the Court agrees that the evidence produced by Plaintiff fails as a matter of law to support a finding of pretext.

Assuming, for present purposes, that Plaintiff could establish a *prima facie* case of retaliation, Defendant would then bear the burden of articulating a legitimate, non-retaliatory reason for its decisions to remove Plaintiff from the GM account and terminate her employment. *See Taylor,* 653 N.W.2d at 628. In this case, Defendant has satisfied this burden by pointing to Gail Pyne's findings, following an investigation, that Plaintiff had participated in the development and implementation of an unsanctioned "supervisor contract" that varied from and contravened Defendant's usual attendance policies, and that Plaintiff had taken steps to cover up the existence of this "supervisor contract." (*See* Pyne Decl., Ex. 1, Pyne 5/22/2013 Report at 1; *see also* Drent Decl. at ¶¶ 12-17 (citing the findings in Pyne's report as the basis for his decision to remove Plaintiff from the GM account).)

Accordingly, the burden returns to Plaintiff to show that "the legitimate reason

offered by the defendant was not the true reason" for Defendant's decision to remove Plaintiff from the GM account and terminate her employment, but instead was "only a pretext" for unlawful retaliation. *Taylor,* 653 N.W.2d at 628. "A plaintiff can prove pretext either directly by persuading the court that a retaliatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Roulston v. Tendercare (Michigan), Inc.,* 239 Mich. App. 270, 608 N.W.2d 525, 530 (2000). To the extent that Plaintiff's response to Defendant's motion can be read as even addressing the issue of pretext in any fashion whatsoever, (*see* Plaintiff's Response Br. at 25 (concluding Plaintiff's terse discussion of the applicable law with the assertion that Plaintiff has "established a prima facie case of a violation of the WPA," and offering no argument that the reason given by Defendant for Plaintiff's discharge is pretextual)), it appears that Plaintiff means to pursue the second sort of challenge, arguing (albeit only implicitly) that Pyne's investigation into the "supervisor contract" was too flawed, in various respects, to support Defendant's reliance on Pyne's findings as a basis for removing Plaintiff from the GM contract.

Plaintiff's various attacks on Pyne's investigation fail to give rise to a genuine issue of material fact as to the purportedly pretextual nature of Defendant's claimed reliance on the results of this investigation as the grounds for Plaintiff's discharge. First, Plaintiff views it as problematic that Pyne concluded her investigation within just sixteen days after she became Plaintiff's supervisor, and that she failed to contact or speak to Plaintiff's former supervisor, Jim Krumbach, in the course of this investigation. (*See*

26

Plaintiff's Response Br. at 18-21.)  Yet, Pyne's report of her investigation reveals that she interviewed Plaintiff and several other supervisors regarding the development and implementation of the "supervisor contract," (*see* Pyne 5/22/2013 Report at 1-3), and Plaintiff fails to suggest who else, other than Krumbach, Pyne should have interviewed or what else she could or should have learned through a more lengthy investigation.[13]  As for Krumbach, he had left Defendant's employ by the time Pyne conducted her investigation, so it would have been more difficult for Pyne to secure Krumbach's cooperation.  More importantly, while Plaintiff makes much of Krumbach's testimony that Plaintiff acted at his direction in drafting the "supervisor contract" and did not deviate from his instructions in carrying out this task, (*see* Plaintiff's Response Br. at 20-21 (citing Krumbach Dep. at 29-31)), Pyne's report expressly recounts Plaintiff's statements that Krumbach granted her the authority to implement the "supervisor contract" and approved of the contract she created, and Pyne evidently credited these statements in her finding that Krumbach "sanctioned" Plaintiff's development of the "supervisor contract," (Pyne 5/22/2013 Report at 1-2).  Under this record, if Pyne had interviewed Krumbach as part of her investigation, he would merely have confirmed Plaintiff's own statements to Pyne and the conclusions reached by Pyne in her report.[14]

---

[13]Notably, most of Pyne's findings are amply supported by the statements of Plaintiff herself when Pyne interviewed her, (*see id.* at 1-2), and Plaintiff does not deny that she made the statements attributed to her in Pyne's report.

[14]In any event, questions about the adequacy of Pyne's investigation into Plaintiff's role in the creation of the "supervisor contract" would not give rise to a genuine issue of material fact as to whether Defendant's stated reliance on this investigation in deciding to remove Plaintiff

Next, Plaintiff suggests that Pyne predetermined the outcome of her investigation into the "supervisor contract," in an effort to curry favor with Beth Webster — who was both Pyne's friend and an important point of contact in Defendant's business relationship with a major client, GM — by retaliating against Plaintiff for her report to Defendant's management that Webster's son, Chad, had falsified fire inspection records for one of GM's facilities.  This claim of bias in Pyne's investigation, however, rests on nothing more than rank speculation.[15]  Although it is theoretically possible that Pyne took her personal or professional relationship with Beth Webster into account as she conducted her investigation, Plaintiff has failed to produce any evidence to support her idle conjecture that this factor, as opposed to myriad other possible considerations, might have influenced Pyne's investigation.  Plainly, a trier of fact cannot be invited to simply guess at the motives behind a challenged employment decision.  *See Miller,* 779 F. Supp.2d at 693-95 (explaining that a plaintiff's "personal beliefs, conjecture and speculation are insufficient to support an inference" of unlawful discrimination or retaliation (internal quotation

---

from the GM account was a mere pretext for unlawful retaliation based on Plaintiff's protected activity. *See Meagher v. Wayne State University,* 222 Mich. App. 700, 565 N.W.2d 401, 412 (1997).

[15]Indeed, in her response to Defendant's summary judgment motion, Plaintiff does not even attempt to marshal any record evidence, whether through her own testimony or otherwise, in support of her conjecture as to the objectives Pyne sought to achieve in her investigation of the "supervisor contract."  Rather, Plaintiff's claim of Pyne's retaliatory motive is based wholly on the groundless assertions of Plaintiff's counsel that Pyne "set out to get" Plaintiff because she "had caused embarrassment to Pyne's friend, Beth Webster."  (Plaintiff's Response Br. at 24.)  Needless to say, the willingness of Plaintiff's counsel to propound conspiracy theories is not a substitute for Plaintiff's obligation to identify actual evidence of an adverse employment action taken with an impermissible retaliatory motive.

marks and citation omitted)); *Brown v. VSI Meter Services, Inc.,* No. 09-11449, 2010 WL 3518023, at *8 (E.D. Mich. Sept. 8, 2010) (holding that a plaintiff cannot show pretext based solely on "his subjective disbelief of [his former employer's] explanation" for his discharge).

Moreover, even accepting Plaintiff's unsupported charge of favoritism, Defendant correctly observes that the WPA prohibits only retaliation against an employee's exercise of protected activity, and not other forms of arguably flawed, unfair, or biased decisionmaking. The Michigan Supreme Court, among other courts (including this one), has emphasized that "[a] plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory [or retaliatory] animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Hazle v. Ford Motor Co.,* 464 Mich. 456, 628 N.W.2d 515, 527 (2001) (internal quotation marks and citations omitted); *see also Hoffman v. Professional Med Team,* 394 F.3d 414, 422 (6th Cir. 2005) (explaining that an "employer's reason for discharge does not have to be a *good* reason . . . for it to escape liability," but "must merely be based on grounds not proscribed by the statute"); *Maletich v. La-Z-Boy Inc.,* No. 11-14615, 2013 WL 3328302, at *18 (E.D. Mich. July 2, 2013) (finding that personality conflicts between the plaintiff and his supervisor did not suffice to establish pretext); *Miller,* 779 F. Supp.2d at 694 n.9 (holding that charges of favoritism or "nepotism, even if proven, cannot sustain a claim of unlawful discrimination"); *Nizami v. Pfizer Inc.,* 107 F. Supp.2d 791, 805 n.15 (E.D. Mich. 2000) (observing that personal

29

animosity "can be a 'proper' — that is, not unlawful — basis for avoiding liability under antidiscrimination law, so long as this personal animus is not the product of the plaintiff's membership in a protected class").  As already explained, the record fails to show that Defendant acted with an unlawful motive to retaliate against Plaintiff's exercise of protected activity — or, indeed, that the relevant decisionmakers who were involved in the removal of Plaintiff from the GM account were even aware that Plaintiff had engaged in protected activity.  Absent such evidence of unlawful retaliatory motive, it is immaterial whether, as Plaintiff contends, Defendant sought to curry favor with a valued customer, or whether Pyne wished to placate a friend who was displeased with accusations of her son's misconduct.

Finally, Plaintiff argues that her exemplary record over many years of employment with Defendant and its predecessors belies the determination of Defendant's U.S. operation manager, Don Drent, that concerns about Plaintiff's "integrity, honesty, and ability to lead," (Drent Decl. at ¶ 15), warranted her removal from the GM account.  Yet, as this Court explained in a recent decision, a showing of pretext cannot rest solely on "the notion that it is implausible that an employee with a history of good evaluations and the absence of any prior disciplinary record" could suddenly be deemed subject to discharge. *Maletich,* 2013 WL 3328302, at *18.  As much as Plaintiff might disagree with Defendant's assessment of the significance and appropriate consequences of Plaintiff's participation in the development of the "supervisor contract," this bare disagreement does not give rise to an inference that Defendant's stated reliance on

30

Plaintiff's role in the implementation of the "supervisor contract" is a mere pretext for unlawful retaliation. *See Meagher,* 565 N.W.2d at 412 ("Although the proofs may raise questions regarding the soundness of [a supervisor's] business judgment and whether [this supervisor] conducted an adequate investigation before exercising her judgment, this was insufficient to create a factual question for the jury concerning whether the reason offered by [the defendant employer] for the [plaintiff's] discharge was a mere pretext to discriminate against plaintiff on the basis of her age."). Neither has Plaintiff pointed to any other evidence — *e.g.,* that another, similarly situated employee with the same or a less exemplary record engaged in similar conduct but was treated more favorably — that could support a finding of pretext. The Court concludes, therefore, that Plaintiff cannot satisfy her burden, under the third step of the *McDonnell Douglas* inquiry, to show that the reason given by Defendant for the termination of her employment is a mere pretext for retaliation against Plaintiff's exercise of whistleblowing activity protected by the WPA.

## IV.  CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's July 23, 2014 motion for summary judgment (docket #17) is GRANTED.

s/Gerald E. Rosen_____
Chief Judge, United States District Court

Dated:  August 18, 2015

I hereby certify that a copy of the foregoing document was served upon the parties and/or

31

counsel of record on August 18, 2015, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager, (313) 234-5135